Donald L. BRUCE, Plaintiff,

v.

Larry G. MASSANARI, Acting Commissioner of the Social Security Administration, Defendant.

No. 4:01CV3027.

United States District Court, D. Nebraska.

Sept. 28, 2001.

Stephen L. Speicher, Lincoln, NE, for plaintiff.

Ellyn Grant, Assist. U.S. Atty., Omaha, NE, for defendant.

### MEMORANDUM AND ORDER

KOPF, District Judge

This is a social security appeal, albeit a somewhat unusual one. Donald L. Bruce (Bruce) argues that the Social Security Administration erred when it decided to stop his disability benefits.

Some four years after he was found disabled, and based upon a thorough physical examination, a different ALJ found that Bruce's medical condition had improved. Then, the second ALJ found that Bruce was no longer disabled within the meaning of the law.

After careful consideration, I affirm the termination of benefits. Briefly, my reasons for this decision are set forth below.

## I. BACKGROUND

Initially, I describe the first decision. After that, I review the decision from which the appeal is taken.

### The March 27, 1995 Decision

In an opinion dated March 27, 1995, ALJ Robert H. Burgess found that Bruce was disabled and that he was entitled to benefits effective March 15, 1993. (Tr. 167.) Judge Burgess found that Bruce suffered from chronic back pain, chronic leg pain, a history of cerebral palsy, and obesity. (Tr. 166.)

In arriving at this decision, Judge Burgess made the following findings:

* Bruce had worked as a machinist and a railroad "carman" until his pain and stiffness caused him to quit. (Tr. 164–165).

* As a child, Bruce suffered from cerebral palsy which resulted in orthopedic problems in his feet. (Tr. 164.) In 1972, he had surgery to shorten the heel cord, remove bunions and repair hammer toes. (Tr. 165.)

* On March 31, 1985, Bruce injured his back while lifting a heavy object and that injury caused him back and leg pain. (Tr. 164.) He received conservative treatment for this injury including medication, physical therapy and "TENS unit" (electrical stimulation) therapies. (Tr. 164.) "[B]ut his symptoms of low back pain and leg discomfort continued." (Tr. 164.)

* In September of 1990, he saw a treating neurologist. That doctor stated that Bruce was unable to lift more than 10 pounds on an occasional basis. (Tr. 164.)

\* Bruce saw a social security doctor in March of 1994. The doctor reported that Bruce complained of pain in his legs, knees and feet but that the foot pain was relieved by wearing "sport type of shoes." (Tr. 164–65.)

\* Bruce was obese at 285 pounds. (Tr. 165.)

\* Bruce testified that he had not worked since March of 1993 due to pain and stiffness in his lower back and knees and swelling in his feet. (Tr. 165.) He testified that his sleep was disrupted by the pain, that he was unable to sit or stand for prolonged period, and that after he sits for awhile he has difficulty standing. (Tr. 165.)

\* Bruce's mother and sister testified and "[t]heir testimony corroborated that of the Claimant." (Tr. 165.)

\* Bruce could not return to his past relevant work, and Bruce lacked the residual functional capacity to work on a full-time basis. (Tr. 165.)

Judge Burgess found that Bruce was credible. (Tr. 166.) The judge stated that the "Claimant's testimony regarding his symptomatology was credible. It was not inconsistent with the pertinent clinical and laboratory findings of record and other criteria for evaluating pain and subjective complaints under *Polaski* ...." (Tr. 166.)

### The April 17, 1999 Decision

ALJ Emily Cameron Shattil issued her opinion on April 17, 1999. She found that Bruce had the following impairments: a history of cerebral palsy as a child with residual orthopedic abnormalities of the feet; mild disc space narrowing at L5–S1 of the lumbar spine with mild osteoarthritis; and recent adult onset diabetes and hypertension, both of which were controlled by drugs and diet. (Tr. 23.) Judge Shattil believed that Bruce had the residual functional capacity to do unskilled and light to sedentary work. (Tr. 24.) Accordingly, effective May 1, 1998, she found

that Bruce was no longer disabled. (Tr. 24.)

Judge Shattil described the evidence regarding Bruce's condition this way:

\* After reviewing Bruce's medical history presented to Judge Burgess (Tr. 14–15), Judge Shattil found· that "[c]urrent medical evidence of record ... confirms that he has not been treated specifically for pain or orthopedic difficulties, apparently since last being seen by his neurologist in September 1990." (Tr. 15.)

\* "[T]he claimant has not presented evidence of any active medical treatment for any condition until December 18, 1998, when he began a screening process for possible ·diabetes...." (Tr. 15.)

\* With regard to the diabetes and hypertension, those ailments were essentially controlled by medication and weight loss. (Tr. 15–16.)

\* During the diabetes screening process, "the claimant also complained of diffuse joint pain in the lower extremities for which he took aspirin. [The diabetes] [d]octors were unable to offer anything new in regards to the joint complaints." (Tr. 16.)

\* The Social Security Administration ordered a medical evaluation of Bruce and that was held on April 11, 1998. (Tr. 16.) Dr. Charles Bendixen, M.D. conducted the examination.

\* Doctor Bendixen found the following: (1) Bruce appeared generally healthy and was alert and oriented; (2) Bruce was able to get on and off the examination table without difficulty; (3) Bruce had a normal gait, although he complained of leg pain on prolonged standing; (4) Bruce's weight (248 pounds) had decreased 37 pounds since 1994; (5) a general physical ex-

amination was unremarkable, save for elevated blood pressure; (6) Bruce did not report symptoms of hypertension; (7) Bruce had a normal range of motion of the cervical and lumbar spine; (8) the doctor did not observe any significant decrease in range of motion regarding the other extremities; (9) Bruce's feet and one leg showed evidence of surgical intervention, but no gross abnormalities; (10) range of motion in the feet was only minimally limited; and (11) there was no limitation in range of motion of the upper extremities. (Tr. 16.)

* The doctor also ordered an x-ray study of the lumbar spine. That study revealed the following: (1) vertebral body heights were intact; (2) there was mild disc space narrowing at L5–S1; and (3) small anterior osteophytes were observed, consistent with mild osteoarthritis. (Tr. 16–17).

* The doctor concluded that Bruce was "physically capable of doing medium exertional work if he were not required to stand for prolonged periods of time." (Tr 16.) In particular, the doctor thought that Bruce could stand for up to four hours a day if he was permitted to sit periodically. (Tr. 16.) Bruce was said to have "good coordination of the legs, and was not considered disabled on that account." (Tr. 16.)

* Bruce and his mother testified. (Tr. 13, 14.) Essentially, they testified that, although he was fairly active, Bruce could not work "because of joint pain and aching." (Tr. 13.) He complained of daily or intermittent pain (depending upon activities) in his feet, knees, hips, shoulder and when he tried to raise his right arm above his shoulder. (Tr. 13.)

* Bruce testified that he might be able to alternate sitting and standing for a total of eight hours, but he had not found work that offered him that opportunity. (Tr. 14.) He also said that he could probably lift up to 20 pounds, but would quickly tire after repetitive lifting. (Tr. 14.)

Judge Shattil decided that Bruce's testimony about disabling pain was not fully credible. (Tr. 19.) She listed a number of factors for this decision, including the following: (1) Bruce had not sought treatment for pain after the initial disability determination; (2) Bruce only used aspirin to treat his pain; (3) he was relatively active despite the pain; and (4) after "placing great probative value on the assessment of Dr. Bendixen," there was no recent medical evidence that supported Bruce's claim of disabling pain. (Tr. 19–20.)

The ALJ then assumed that Bruce had the residual functional capacity to do the following: (1) lift and carry a maximum of 20 pounds occasionally, with frequent lifting limited to 10 pounds; (2) push and pull up to 10 pounds; (3) stand for up to 4 hours and sit for up to 4 hours; and (4) drive a car. (Tr. 20, 55.) The judge further assumed that "we find that the claimant has the impairments set forth in the documentary evidence[,]" the "right arm can't lift above head and shoulder[,]" and Bruce "should avoid extremely cold conditions or exposure to vibrations." (Tr. 55.)

Given these assumptions, the vocational expert testified that Bruce could find light or sedentary unskilled work in the national economy and in Nebraska. (Tr. 56.) That work included jobs like assembler, cashier or guard. (Tr. 55–56.) Based upon the testimony of the vocational expert, the ALJ concluded that Bruce was no longer disabled. (Tr. 21–22.)

## II. ANALYSIS

Termination of benefits is governed by 42 U.S.C. § 423(f), which provides in rele-

vant part that benefits may be discontinued only if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work and (2) the individual is now able to engage in substantial gainful activity. *Id., see also* 20 C.F.R. § 404.1594.

### A.

The Eighth Circuit has described the law in this sort of a case as follows:

The initial critical question in a case such as this is whether the claimant's physical condition has improved since the prior award of disability benefits. The claimant in a disability benefits case has a "continuing burden" to demonstrate that he is disabled, *Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. *Lewis v. Heckler*, 808 F.2d 1293, 1297 (8th Cir.1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. § 404.1594(b)(2)-(5).

... Medical improvement is defined as a decrease in the medical severity of the impairments present at the time of the most recent favorable medical condition. 20 C.F.R. §§ 404.1594(b)(1). The decision concerning whether or not an individual's condition has improved is primarily a factual inquiry, which so often depends upon the credibility to be given to the various witnesses, a responsibility particularly given to the trier of fact. *Benskin v.. Bowen*, 830 F.2d 878, 883 (8th Cir.1987). As a result, if substantial evidence supports the Secretary's position then it must be upheld. *See Steele v. Sullivan*, 911 F.2d 115, 116 (8th Cir.1990) (Secretary has "zone of choice" within which to operate).

*Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir.1991) (back pain case; evidence sustained finding of improved medical condition; evidence sustained decision that recipient could perform jobs in the national and local economy). *Accord Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.2001) ("Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility.")

 Turning then to the first question, there is substantial evidence in the record to show that Bruce's medical condition had significantly improved. Doctor Bendixen conducted a very thorough examination of Bruce. He found that Bruce had essentially unimpeded range of motion without any substantial complaints of pain. This finding was supported by a physical examination and X-ray studies. Doctor Bendixen was of the opinion that Bruce could do work at the medium level. Thus, the government cleared the first hurdle. Substantial evidence shows that Bruce had gotten much better.

As to the second question, regarding whether Bruce could find and do meaningful work, I also find that there is evidence in the record sufficient to support the ALJ's decision. Doctor Bendixen's opinion when coupled with the testimony from the vocational expert satisfied the government's burden of proof as to that question. *See Nelson*, 946 F.2d at 1317 (where claimant had previously been awarded benefits due to a painful back problem and the ALJ found that his medical condition had improved, testimony of vocational expert that

the claimant could work at such jobs as a security guard was sufficient to discharge the government's burden of proof).

### B.

■ On appeal, Bruce attacks the ALJ's credibility finding that substantially discounted his claims of disabling pain. Given that after the first disability determination, (1) Bruce took only aspirin, (2) Dr. Bendixen found no severe pain and nearly a full range of motion, (3) Bruce did not consult his own doctors for pain, and (4) Bruce had a relatively active life [1], it was not error for the ALJ to disbelieve him. *See Nelson*, 946 F.2d at 1317 (where no doctor stated that the claimant suffered from severe pain, where the claimant took only aspirin, and where the claimant had a "moderate daily schedule," the ALJ did not err in discounting complaints of disabling pain).

Bruce also makes other arguments on appeal, but none are meritorious. I discuss below those that merit a brief response.

As to the claim that the ALJ applied the wrong burden of proof or allocated the burden of proof improperly, I have carefully read the written opinion of the ALJ as well as the hearing transcript. After having done so, I believe the judge properly allocated and applied the correct burden.

As to the claim that the ALJ used improper hypothetical questions when addressing the vocational expert, I do not agree that the phrasing of the questions requires reversal. Although references to "impairments set forth in the documentary evidence" (Tr. 54–55) are not favored, the questions, when read in their entirety, pass muster. After using the questioned language, the ALJ went on to make her hypothetical questions clear and representative of Bruce's condition. (Tr. 54–57.) Consequently, there was no reversible error here. After all, the dispute was not whether Bruce was impaired, but whether his pain claim was credible. Both the judge and the vocational expert clearly understood that issue. (Tr. 56.[2])

Finally, the argument that the ALJ used the word "work," rather than the phrase "substantial gainful activity," in deciding that the claimant's disability had ceased, is a mere quibble. When the opinion and the transcript of the hearing are read in their entirety, it is evident that the judge applied the correct legal test.[3]

IT IS ORDERED that the decision appealed from is affirmed and judgment in favor of the defendant shall be entered by separate document.

### JUDGMENT

Pursuant to the related memorandum and order.

JUDGMENT is entered for the defendant and against the plaintiff providing that the decision appealed from is affirmed and the appeal is denied.

---

1. For example, Bruce's mother testified that, despite her protests, Bruce would climb on her roof to fix her television antenna. (Tr. 50.)

2. The ALJ asked the vocational expert: "If he were credible do you think he could these jobs?" (Tr. 56.) The vocational expert responded that if Bruce were credible he could not work. (Tr. 56–57.)

3. See, for example, the phrasing of findings 8 and 10 of the ALJ's opinion. (Tr. 23–24.)