Armandina SANCHEZ–
WENTZ, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security Administration, Defendant.

No. 4:01CV3226.

United States District Court,
D. Nebraska.

Aug. 23, 2002.

James A. Wentz, Truell, Murray Law Firm, Grand Island, NE, Joanne H. Ottmar, Ottmar, Ottmar Law Firm, Jamestown, ND, for plaintiff.

Ellyn Grant, Assistant United States Attorney, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER ON REVIEW OF THE FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY

URBOM, Senior District Judge.

This matter is before me on Plaintiff Armandina Sanchez Wentz's Complaint, filing 1, which is brought pursuant to 42 U.S.C. § 405(g). The plaintiff seeks review of the Defendant Commissioner of Social Security's denial of her application for disability insurance benefits under Title II of the Social Security Act, as amended. *See* 42 U.S.C. §§ 401 *et seq.* In accordance with my order dated December 19, 2001, (*see* filing 12), the parties have submitted briefs in support of their respective positions. The defendant has also filed an answer to the complaint, along with a transcript of the administrative record. (*See* filings 10, 11). After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I. BACKGROUND

The plaintiff filed an application for disability insurance benefits on September 7, 1999. (*See* Complaint, filing 1, ¶ 5; Br. in Supp. of Compl. (hereinafter "Pl.'s Br.") at 7.)[1] In her application, the plaintiff claimed that she was disabled and unable to work full-time as of March 17, 1994. (*See* Tr. at 84.) According to her disability report, the condition that allegedly limited the plaintiff's ability to work was a "chronic heart condition with a mitral valve implant making it difficult to breath[e] and stand [illegible—possibly 'sit'] prolong [sic] periods or stand prolong [sic] periods due to swelling." (Tr. at 97.)[2] The plaintiff's application for benefits was denied both initially and upon reconsideration. (Tr. at 65, 68–70; 66, 73–74.)

The plaintiff then requested a hearing before an Administrative Law Judge (hereinafter "ALJ") on March 23, 2000. (*See* Tr. at 75.) The ALJ conducted a hearing on December 6, 2000,[3] and rendered a decision unfavorable to the plaintiff on February 16, 2001. (*See* Tr. at 8, 11.) In his decision, the ALJ found, *inter alia*, the following:

3. The record documents a history of multiple medical problems and reveals that claimant has undergone several surgeries in the past. Specifically, there is clinical confirmation that claimant underwent mitral valve replacement due to valve disease attributed to the usage of

---

1. The plaintiff has referred me to no evidence in support of this date, and the records submitted by the defendant suggest that the plaintiff actually filed her application on or about August 18, 1999. (*See* Transcript, filing 11 (hereinafter "Tr.") at 84–86.) However, the copy of the plaintiff's application that has been provided to me is partly illegible, and I note that the Administrative Law Judge who reviewed this case indicated that the application was filed on September 7. (*See* Tr. at 11.) Therefore, for the purposes of this memoran-

dum, I shall assume that the plaintiff's application was filed on September 7, 1999.

2. A detailed summary of the plaintiff's medical history may be found in the record. (*See, e.g.,* Tr. at 13–14, 16–24.)

3. At this hearing, the plaintiff moved to amend her alleged "onset date" from March 17, 1994, to May 29, 1999. (*See* Tr. at 37.) This motion was granted by the ALJ. (*See id.*)

"Phen Fen" in 1994; she has a history of congestive heart failure, a history of chronic sinusitis, a history of migraine headaches, and a history of insulin dependent diabetes mellitus. Claimant also has a history of peripheral vascular disease and she is status post left carotid endarterectomy in April of 1998. In addition, claimant is status post a cerebrovascular accident in September of 1998 and she is status post a splenectomy on December 14, 1998, for subcapsular hematoma. The undersigned is satisfied that claimant has medically determinable impairments which place more than slight or minimal limitations on claimant's ability to perform basic work-related activities and, accordingly, claimant's impairments meet the definition of "severe" within the meaning of the Social Security Act (20 CFR § 404.1520(b)[) ].

4. While claimant's medically determinable impairments are severe, they do not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

5. For the reasons set forth in the body of this decision, the undersigned cannot find claimant's allegations regarding her limitations totally credible.

. . . . .

7. The claimant lacks the functional capacity to perform work at the light, medium, heavy, or very heavy exertional levels. However, she retains the residual functional capacity to perform work at the sedentary level of exertion.....

8. The claimant's past relevant work as a social worker/administrator, as this job is generally performed throughout the national economy, does not require the performance of work-related activities precluded by claimant's residual functional capacity (20 CFR § 404.1565).

9. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work as a social worker/administrator.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

(Tr. at 28–29.)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision (*see* Tr. at 6), but her request was denied on June 29, 2001 (*see* Tr. at 4). Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On August 24, 2001, the plaintiff filed the present action. Her complaint raises four bases for relief: 1) "[t]he Commissioner did not apply the proper legal standards"; 2) "[t]he Commissioner's decision is not supported by substantial evidence"; 3) "[t]he Commissioner's credibility finding is not supported by substantial evidence"; and 4) "[t]he Commissioner did not give the proper weight to the opinion of the claimant's treating physician and psychologist." (Compl., filing 1, ¶¶ 6–9.) The plaintiff seeks a reversal of the Commissioner's decision, or, alternately, an order remanding the case for further proceedings. (*See id.* at 2.) In addition, the plaintiff requests an award of attorney's fees and costs. (*See id.*) My analysis of the plaintiff's complaint follows.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny disability benefits, I must ascertain "whether there is substantial evi-

dence on the record as a whole to support the ... decision." *Hutsell v. Sullivan*, 892 F.2d 747, 748–49 (8th Cir.1989) (citation omitted). Substantial evidence consists of " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The decision should not be reversed "merely because substantial evidence would have supported an opposite conclusion." *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir.1995) (citation omitted). However, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984). Indeed, "[t]o determine whether existing evidence is substantial, '[I] must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it.' " *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999) (quoting *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993)). In addition, the court's review of the decision must include a determination as to whether the proper legal standards were applied. *See Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

The ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ continues the analysis until either a claimant is found to be "not disabled" at one of the steps, or the claimant is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in any substantial gainful activity. *Id.* § 404.1520(b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. *Id.* Step two requires the ALJ to determine whether the claimant has an impairment or a combination of impairments that significantly limits her ability to do basic work activities. *Id.* § 404.1520(c). Such activities include, *inter alia*, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, seeing, hearing, speaking, and understanding. *Id.* § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *Id.* § 404.1520(c). Step three requires the ALJ to compare the claimant's impairment or combination of impairments to a list of predetermined "disabling" impairments. *Id.* § 404.1520(d). If the claimant has an impairment that is listed or is equal to a listed impairment, the analysis ends and the claimant is found to be "disabled." *Id.* If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. Step four requires the ALJ to determine whether the impairment or impairments prevent the claimant from engaging in past relevant work. *Id.* § 404.1520(e). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *Id.* Step five requires the ALJ to consider the claimant's residual functional capacity,[4] age, education, and past work experience to determine whether the claimant can do work other than that which the claimant has done in the past. *Id.* § 404.1520(f). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. The burden is

---

4. " 'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."

*Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

on the claimant to show that she is unable to perform any past relevant work at step four, but at step five the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity to do other kinds of work. *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

## III. ANALYSIS

I mentioned previously that the plaintiff has advanced four arguments in support of her claim for benefits. I shall now analyze each of these arguments.[5]

### A. Whether the Commissioner's Credibility Finding Was Improper

The ALJ determined that the plaintiff's testimony was not fully credible. (*See* Tr. at 25.) More specifically, the ALJ found that the plaintiff exaggerated the severity of her pain and fatigue:

> Given the lack of significant medical evidence supporting pain and fatigue of the level alleged by the claimant, in combination with the indications in the record that claimant has likely been dependent on narcotic medication which possibly results in withdrawal headaches or drug-seeking behavior, as well as indications in the record that claimant has failed to comply with her treating physician's advice to participate in physical therapy to gain optimal improvement in her symptoms, combined with the fact that the claimant appears capable of keeping scheduled appointments and taking care of family responsibilities when necessary, the undersigned cannot find claimant's testimony regarding the alleged severity of her pain and fatigue fully credible.

(Tr. at 25.) The plaintiff claims that the ALJ's credibility determination was improper.

▆▆▆▆ Generally, an ALJ's credibility determinations are entitled to "considerable weight." *Barry v. Shalala*, 885 F.Supp. 1224, 1242 (N.D.Iowa 1995) (quoting *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 392 (7th Cir. 1992)); *see also Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir.1991) ("[B]ecause evidence of pain tends of necessity to be subjective in nature, it is for the ALJ in the first instance to evaluate the credibility to be accorded a claimant's subjective complaints of pain" (citations omitted)); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir.2000) ("Where adequately explained and supported, credibility findings are for the ALJ to make." (citation omitted)). An ALJ may not, however, disregard a claimant's subjective complaints of pain "solely because of a lack of objective [medical] evidence." *Delrosa*, 922 F.2d at 485 (citation omitted); *see Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). To the contrary, such complaints may be discredited only "if they are inconsistent with the evidence on the record as a whole." *Delrosa*, 922 F.2d at 485 (citations omitted). In addition, "where an ALJ rejects a claimant's testimony regarding pain, he must make an express credibility determination detailing his reasons for discrediting the testimony." *Id.* (citations omitted). When making such a determination, an ALJ is guided by the Eighth Circuit's decision in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which requires the ALJ to consider fully all evidence "relating to the claimant's subjective complaints of pain, including the claimant's daily activities; the duration, frequency and intensity of

---

**5.** For clarity's sake, I have chosen to alter the organizational sequence of the arguments presented by the plaintiff.

pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication, and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski*, 739 F.2d at 1321–22). The claimant's "relevant work history" is an additional factor to be considered. *See Polaski*, 739 F.2d at 1322. An ALJ "[is] not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." *Lowe*, 226 F.3d at 972 (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)); *see also Vonbusch v. Apfel*, 132 F.Supp.2d 785, 794 (D.Neb.2001) ("[A]n ALJ who discredits a claimant's testimony has properly assessed that claimant's credibility if the ALJ makes an express credibility determination, acknowledges and considers the *Polaski* factors, and details the reasons for discrediting the testimony by setting forth the inconsistencies between the claimant's subjective complaints and the record as a whole. There is no requirement that each *Polaski* factor be discussed separately and in detail.").

In this case, the ALJ recognized that in evaluating the plaintiff's subjective complaints of pain, he must rely on the *Polaski* factors described above. (*See* Tr. at 17.) He first noted that the plaintiff's prior work record "reveals a capacity for sustained employment and raises no motivational concerns." (*Id.* (citation omitted).) He then began a lengthy review of the plaintiff's medical evidence, which was prefaced by the following comment:

> The record documents that claimant has sought medical treatment on multiple occasions with numerous complaints ranging from chronic abdominal pain, earaches, headaches, facial pain, shortness of breath, sore throats, bronchitis, fatigue, toothaches, rashes, tailbone pain, wrist pain, right arm weakness, left toe pain, right thumb pain, right leg weakness, syncopal episodes, and nau-

> sea. While the record contains clinical documentation supporting several of these symptoms, it is important to point out that there are suggestions in the record that claimant has developed a narcotic dependency and several of her complaints may stem from drug-seeking behavior.

(Tr. at 17.) The plaintiff disputes the ALJ's conclusion that there is a "lack of significant medical evidence supporting pain and fatigue of the level alleged by the claimant," (Tr. at 25), arguing, *inter alia*, that she sought medical care for headaches and abdominal pain on a combined total of at least 32 occasions, respectively. (Pl.'s Br. at 15–16.) She contends that the fact that she has sought medical treatment on numerous occasions "should give credence to the fact that her pain and fatigue complaints are credible." (*Id.* at 16.) The plaintiff also refers to her mitral valve replacement, congestive heart failure, chronic sinusitis, migraine headaches, diabetes, stroke, "carotid endarterectomy," splenectomy, staph infection and coma, suggesting that these events also corroborate her alleged fatigue and pain. (*Id.* at 15–16.) The plaintiff states that because there is a medical diagnosis for her abdominal pain and because she completed the Chronic Pain Rehabilitation Program at Sister Kenney Institute (*see* Tr. at 240), her testimony regarding pain should be believed. (*See* Pl.'s Br. at 16.) Finally, she argues that her heart problem explains her fatigue and shortness of breath. (*See id.* at 16–17.)

■ There is indeed evidence that supports the plaintiff's subjective complaints of pain and fatigue, and it seems to me that the ALJ recognized as much. However, I find that the ALJ's decision to discredit the plaintiff's testimony due to evidence of narcotic dependency and drug-seeking behavior is supported by substan-

tial evidence. The record indicates that the plaintiff's doctors often speculated that her headaches were due to narcotic withdrawal and that she was dependent on narcotic medication. (*See* Tr. at 153, 158, 190–91, 330, 335, 337.) The plaintiff was assessed as having "abdominal pain of unknown etiology and chronic pain syndrome with classic symptoms of pain magnification, drug misuse and inadequate coping mechanisms." (Tr. at 153.) When the patient's Morphine was "tapered" during one hospital visit, she stated, "I don't agree with the pain people. I need more medicine. Send me home. My family physician will help me." (*Id.*) The record continues, "She was observed to be holding her abdomen, coughing loudly and moaning throughout the morning with an over-dramatized display of pain, writhing in the bed until she was upside down. The patient demanded that either she be restarted on Morphine or that she would leave immediately to get a second opinion with her family physician at home." (*Id. See also* Tr. at 158 ("[I]t is somewhat difficult to do a thorough exam secondary to the patient's grimacing, guarding, and complaints of pain. Her response to the exam seems obviously exaggerated especially in light of the way she was sitting comfortably when I entered the room. . . . She seems to exhibit symptom magnification and a tendency towards misuse of opioid pain medications. She seems to have a very low pain tolerance. . . . She would be a good candidate for the pain psychology intervention including cognitive behavioral reconditioning and coping skills.").) Another physician noted that the plaintiff was a "[v]ery somatic lady complaining [of]

really nothing when I come in and then the complaints start listing before I can leave." (Tr. at 251.) Yet another physician noted that there were "persistent inconsistencies in the patient's exam and . . . somewhat unusual neurologic symptoms that certainly would not typically occur with a brainstem insult," and added that he was "concerned that there is still a good deal of psychogenic overlay involved with her persistent deficits." (Tr. at 227–28.) [6] Even the plaintiff's own regular physician, Dr. McMillan, noted that the plaintiff "[h]as had questionable conversion reaction with the hemiparesis and report of a brainstem stroke but later negative for stroke." (Tr. at 513.) [7] In sum, the ALJ appeared to recognize the plaintiff's extensive medical history, but also noted that at least some of her complaints could be attributed to mere attempts "to obtain prescription narcotic pain relievers." (Tr. at 25.) In making a determination that a plaintiff's testimony is not credible, an ALJ may properly consider the plaintiff's exaggeration of symptoms. *See, e.g., Jones v. Callahan,* 122 F.3d 1148, 1151–52 (8th Cir.1997). The ALJ expressly found that the plaintiff's testimony was not credible given the objective medical evidence and evidence that the plaintiff exaggerated or invented symptoms in order to obtain drugs. This finding is supported by substantial evidence, and the fact that a different conclusion might be drawn from the record is not sufficient to reverse the Commissioner's decision. *See Baker v. Apfel,* 159 F.3d 1140, 1145 (8th Cir.1998); *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993);

**6.** "Psychogenic," as I believe the term is used here, means "[o]f mental origin or causation." STEDMAN'S MEDICAL DICTIONARY 1476 (27th ed.2000).

**7.** A conversion reaction refers to "[a]n unconscious defense mechanism by which the anxi-

ety which stems from an unconscious conflict is converted and expressed symbolically as a physical symptom." STEDMAN'S MEDICAL DICTIONARY 406 (27th ed.2000). Hemiparesis refers to "[w]eakness affecting one side of the body." *Id.* at 800.

*Browning v. Sullivan,* 958 F.2d 817, 821–22 (8th Cir.1992).

In response to the evidence concerning the plaintiff's narcotic dependency and drug-seeking behavior, the plaintiff argues, without providing a citation to the appropriate portion of the record, that "her treating physician has said that the only type of pain medication which can be given to her is a narcotic," and that "Dr. Bowar at the Sister Kenny Pain Institute found that she did not have a classic dependency on this medication." (Pl.'s Br. at 17.) However, even if these statements were supported, there remains substantial evidence from other treating physicians that suggests that the plaintiff exaggerated symptoms, including pain, in order to obtain medication.

The plaintiff also suggests that the ALJ had no medical basis for his conclusion that the plaintiff was not credible due to her possible dependance on narcotics. This argument is belied by the record, which contains several "medical" documents that support the ALJ's credibility determination. (*See, e.g.,* Tr. at 153, 158, 190–91, 227–28, 251, 330, 335, 337, 513.)

The ALJ also found that the plaintiff was not credible because the plaintiff "failed to comply with her treating physician's advice to participate in physical therapy to gain optimal improvement in her symptoms," although she "appears capable of keeping scheduled appointments and taking care of family responsibilities when necessary." (Tr. at 25.) The evidence shows that between November 4 and December 14, 1999, the plaintiff attended three physical therapy sessions, cancelled two sessions, and "no showed" at two other sessions. (Tr. at 468.) The evidence also indicates that "[c]ompliance continues to be Armandina's main difficulty with her progression in physical therapy." (*Id.*) The ALJ properly noted the plaintiff's physical therapy compliance

problems, and his conclusion that these problems cast doubt upon the plaintiff's credibility is supported by substantial evidence. For example, while the plaintiff missed four of seven physical therapy sessions in November and December, she made at least three visits to doctors during this same time period. (*Compare* Tr. at 342–47 *with id.* at 468.)

The plaintiff argues that the ALJ's reasons for finding her testimony to be not credible are contradictory, presumably because the ALJ's finding that the plaintiff could keep appointments is "in conflict" with his finding that she missed physical therapy sessions. (*See* Pl.'s Br. at 17.) This argument is not persuasive, and it merits no lengthy discussion. There is evidence supporting the ALJ's conclusion that the plaintiff seems able to keep appointments with her physicians but not her physical therapist. The plaintiff also claims that others helped her with family responsibilities "when she was unable to do so." (Pl.'s Br. at 17.) I assume the plaintiff means to argue that the ALJ's conclusion that the plaintiff could take care of family responsibilities "when necessary" (Tr. at 25) was not supported by substantial evidence. This argument too is not persuasive. The ALJ's finding that the plaintiff could complete family responsibilities "when necessary" was clearly not meant to suggest that the plaintiff was able to complete all of her responsibilities without assistance. Instead, it seems to me that the ALJ's finding was intended to emphasize his belief that the plaintiff's alleged impairments would have allowed her to attend physical therapy sessions more regularly, which in turn supports his determination that the plaintiff engaged in drug-seeking behavior and thus was not fully credible.

Finally, the plaintiff argues that there is substantial evidence supporting the plaintiff's testimony regarding the extent of her

pain and fatigue. This evidence includes statements made by her husband, business partner, and the plaintiff herself. (*See* Pl.'s Br. at 18 (citing Tr. at 53, 114–122).) [8] The ALJ did not mention the plaintiff's husband's statement in his decision.[9] However, the ALJ clearly discounted the testimony of both the plaintiff and the plaintiff's business partner. (*See* Tr. at 17, 25 (discussing plaintiff's testimony); *id.* at 25–26 (discussing Linda Johnson's testimony).)

Implicit in the plaintiff's argument is the claim that the ALJ improperly discounted the statements of these witnesses. I have already determined that the ALJ's decision to discredit the plaintiff's testimony was supported by substantial evidence. In connection with the testimony of Linda Johnson, the plaintiff's business partner, the ALJ stated the following:

> The undersigned has also considered the testimony provided by Linda Johnson, claimant's friend, and he appreciates such testimony; however, he cannot assign significant weight to such testimony as it basically mirrored that provided by claimant and because Ms. Johnson is more likely sympathetic to claimant and her situation. Moreover, as indicated above, the record when viewed in its entirety fails to support that claimant's impairments render claimant so significantly limited.

(Tr. at 25–26.) After having discredited the plaintiff's testimony regarding the extent of her pain and fatigue, the ALJ may properly discredit cumulative testimony provided by other witnesses. *See Black v. Apfel,* 143 F.3d 383, 387 (8th Cir.1998). Thus, I conclude that the ALJ properly discredited the testimony of Linda Johnson.

The ALJ did not expressly discredit the statement of James Wentz, the plaintiff's husband. Of course, this does not mean that the ALJ did not consider the statement. *See Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). The information provided by the plaintiff's husband generally restates evidence that may be found in the plaintiff's and Ms. Johnson's testimony, although I note that Mr. Wentz's statement is more detailed. (*Compare* Tr. at 114–122 *with id.* at 40–43, 45, 46–50, 52–60.) Since I have already determined that the ALJ properly discounted the similar testimony of the plaintiff and Johnson, and since the same reasons for discounting their testimony support discounting the statement of Mr. Wentz, I find that the ALJ's failure to mention the husband's statement specifically in his opinion does not provide grounds for reversing the decision. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir.2000) ("[B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential.")

Although it seems likely that the plaintiff suffers from some degree of pain, " 'the real issue is how severe that pain is.' " *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998) (quoting *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993)). In evaluating this issue, the ALJ properly analyzed the plaintiff's credibility in accordance with the *Polaski* directives. His decision should not be reversed "merely because substantial evidence would have supported

---

8. The plaintiff also refers to a statement offered by her treating physician, which shall be addressed separately below. (*See infra* Part III.B.)

9. The plaintiff's husband did not testify at the hearing before the ALJ. However, he provided a statement that appears in the record. (*See* Tr. at 114–122.)

**978**

an opposite conclusion." *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir.1995). Accordingly, for the reasons outlined above, I conclude that the ALJ's finding that the plaintiff's testimony lacked credibility is supported by substantial evidence in the record.

### B. Whether the ALJ Failed to Give Proper Weight to the Physician's Opinions

The plaintiff's treating physician, Dr. McMillan, prepared a letter that appears in the record. (*See* Tr. at 533.) This letter states, in part, as follows:

> [The plaintiff] has recently had a functional capacity assessment at MeritCare Occupational Health site in Fargo, N.D. It is my assessment that her ability to do even sedentary work is going to be markedly limited to as little as one day a week. Even doing sedentary work, she will need to have frequent rest periods even during a six hour period.
>
> It is my opinion that due to her health problems she is not capable of maintaining full or part time employment. The persistent fatigue and pain which she experiences significantly affect her employability.

(Tr. at 533.) The ALJ discussed this letter in his decision (*see* Tr. at 24) and found that it was not due significant weight:

> The undersigned appreciates the opinion provided by Dr. McMillan; however, the record lacks significant clinical signs and medical findings supporting that claimant's medically determinable impairments render her so significantly limited and, absent such clinical confirmation, it is reasonable to conclude that Dr. McMillan based his opinion on claimant's subjective complaints which, for the reasons to be outlined below, the undersigned cannot find fully credible. For these reasons, the undersigned cannot assign significant weight to the opinion

provided by Dr. McMillan in his letter dated December 5, 2000.

(Tr. at 24 (citation omitted).) The plaintiff argues that the ALJ should not have discounted Dr. McMillan's opinion.

 "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001) (quoting *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir.2000)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Id.* (citing *Prosch,* 201 F.3d at 1013). Also, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel,* 158 F.3d 425, 428 (8th Cir.1998) (quoting *Behnen v. Califano,* 588 F.2d 252, 254 (8th Cir.1978)).

 The ALJ concluded that Dr. McMillan's opinion was based upon the plaintiff's subjective complaints of pain and fatigue. I find that this conclusion is supported by substantial evidence. Indeed, Dr. McMillan stated specifically in his letter that "[t]he persistent fatigue and pain which she experiences significantly affect her employability." (Tr. at 533.) Dr. McMillan's letter appears to be based merely upon his "assessment" of the functional capacity evaluation completed by the plaintiff in North Dakota (*see* Tr. at 533), and it is not supported by references to "medically acceptable clinical and laboratory diagnostic techniques." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001). It is also important to note that Dr. McMillan's letter does not offer an opinion regarding the presence or absence of a clinically

identifiable medical impairment, but instead presents the doctor's opinion regarding the plaintiff's ability to return to work. "[S]tatements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir.1996) (quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991)). "Such statements simply 'are not conclusive as to the ultimate question' of disability." *Id.* (quoting *Nelson*, 946 F.2d at 1316–17). Finally, I note that Dr. McMillan's opinion regarding the severity of the plaintiff's pain and fatigue is inconsistent with a substantial amount of evidence that has been provided by other treating physicians. As I discussed previously, there is evidence that the plaintiff engages in drug-seeking behavior and exaggerates symptoms. (*See supra* Part III.A.) For these reasons, I find that the ALJ properly concluded that Dr. McMillan's opinion was not entitled to significant weight.

The plaintiff points out that other "treating physicians" have opined that the plaintiff should not return to work. First, the plaintiff refers me to a letter from Dr. Bowar to Dr. McMillan dated July 29, 1999, which states, "[The plaintiff] did discuss an advocate's job which is full time across the state, which I don't think she could manage as she has indicated you had expressed. If it were only on a part time basis I think it may be of value, but at this point in time I think her health and family are more important and this would take too much time." (Tr. at 240.) Next, it appears that Dr. Ayala stated that "with her current status, I do not think [the plaintiff] can handle any full-time or part-time job, until we make her better," in his discussion of the plaintiff's office visit on October 31, 2000. (Tr. at 466.) Finally, Dr. Zogg stated in a letter dated May 9, 2000, that "[t]his severe pain, however,

appears to be disabling to her and appears to be the predominant reason for which she is currently taking her Stadol." (Tr. at 477.)

The plaintiff claims that the ALJ "totally ignored" these opinions when arriving at his decision. (Pl.'s Br. at 22.) It is true that the ALJ did not quote these specific statements in his decision; however, there is no requirement that he do so, and the fact that these statements were not specifically mentioned by the ALJ does not mean that he failed to consider them. *See, e.g., Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000). In fact, the ALJ quoted from Dr. Zogg's letter at length (*see* Tr. at 22), which belies the plaintiff's suggestion that the ALJ ignored the document. Furthermore, to the extent that the plaintiff claims that these physicians' opinions mandate an award of benefits, her argument must be rejected. The ALJ is not required to adopt any of these opinions on the ultimate issue of whether the plaintiff is capable of returning to her previous work. *See, e.g., Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir.1998). In addition, none of the statements cited by the plaintiff appear to be based upon clinical or diagnostic analyses. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001). Instead, they seem to be rather informal, conclusory opinions: Dr. Ayala concluded his treatment report with the vague statement that the plaintiff couldn't handle even part-time work "until we make her better," and Dr. Zogg stated only that the plaintiff's pain appears to be disabling to her. (*See* Tr. at 466, 477.) Dr. Bowar indicated that part-time work could be valuable for the plaintiff (*see* Tr. at 240), which is an opinion that seems to contradict the statements of the other physicians. Finally, I find that the doctors each based their opinions on their estimation of the severity of pain (*see* Tr. at 240 (Bowar), 477 (Zogg)) or fatigue (*see* Tr. at 465–66 (Ayala)) experienced by the plain-

tiff, and there is substantial evidence from other treating physicians to support a finding that the plaintiff exaggerated the severity of those symptoms (*see* supra Part III.A). On the whole, I find that these physician's opinions are not due significant weight, and are certainly not due controlling weight. I therefore reject the plaintiff's argument that the opinions of Drs. McMillan, Bowar, Ayala, and Zogg require an award of benefits.

## C. Whether the Commissioner Applied the Proper Legal Standards

During the hearing, the ALJ questioned a vocational expert named James Berglie. (*See* Tr. at 60–62.) Berglie testified that a person with the limitations set forth in the plaintiff's functional capacity evaluation could perform her past work as a social worker/administrator. (*See* Tr. at 60.) The ALJ also asked the witness whether that person could perform such work if she were unable to complete a seven and one-half or eight hour workday for five consecutive days per week. (*See id.*) To this question, the witness responded, "No." (*Id.*) In his decision, the ALJ stated as follows:

> As noted above, the medical consultants working for the Disability Determination Services (DDS) found that claimant, despite her impairments, retained the functional capacity for light exertional work activity. The undersigned is not bound by the previous determination made by the DDS medical consultants and, as will be outlined below, the undersigned is satisfied that claimant's impairments render her more significantly limited and preclude her from performing more than sedentary exertional work activity.

> As noted above, claimant underwent a functional capacities assessment on October 24, 2000, the results of which fell into the category of sedentary exertional work. After careful consideration of the record as a whole, the undersigned finds claimant's functional capacities evaluation results supported by the record in its entirety. . . .

> . . . . .

> The evidence in this case establishes that the claimant has past relevant work as a social worker/administrator, work which was skilled in nature and sedentary in exertion. Claimant, on a "Disability Report" completed for the Administration on August 21, 1999, indicated that she worked twelve hours a day, seven days a week from November of 1984 to February of 1994, following which her hours continued to decrease until she stopped working completely on May 28, 1999. As indicated above, the Administration determined that claimant's work from November 1, 1984, through May 28, 1999, despite being part-time in nature, constituted substantial gainful activity and the undersigned found this determination supported by the record when viewed in its entirety.

> . . . The vocational expert . . . testif[ied] that an individual with the limitations described in [the functional capacity assessment dated October 24, 2000,] could perform claimant's past work as an administrator/social worker as this job is generally performed at the sedentary level of exertion.

> The undersigned finds the testimony provided by the vocational expert to be both objective and professionally reliable. . . . As claimant retains the functional capacity to perform her past relevant work as a social worker/administrator, she does not meet the definition of "disabled" as that term is defined in the Social Security Act, at any time through the date of this decision.

(Tr. at 26–27 (citations omitted).)

The plaintiff claims that "the ALJ only asked questions about whether the claim-

ant could perform her past relevant work," and that "[t]he ALJ did not make any inquiry with the vocational expert concerning whether the claimant could perform any other work in the national economy." (Pl.'s Br. at 8.) The plaintiff then argues that: 1) the case should be remanded for further testimony "to fairly develop the record as to whether or not there are other jobs within the national economy which she could perform," (Pl.'s Br. at 10); and 2) this remand is necessary because the ALJ failed to consider "the fact that the residual functional capacity was done on one day in her life," (Pl.'s Br. at 9).

The ALJ's conclusion that the plaintiff could return to her past relevant work means that the plaintiff was found to be not "disabled" at step four of the five-step analysis described in Part II of the memorandum. The plaintiff argues, in essence, that the case must be remanded because the ALJ did not gather evidence relevant to step five. It seems to me, however, that the plaintiff's argument fails unless the ALJ's determination that the plaintiff was not disabled at step four was improper. *See, e.g., Gaddis v. Chater,* 76 F.3d 893, 896 (8th Cir.1996). For the reasons set forth elsewhere in this memorandum (*see generally* Part III), I find that the ALJ's step -four determination that the plaintiff was not disabled is supported by substantial evidence. Therefore, the ALJ's failure to gather evidence relevant to step five of the analysis is inconsequential.

The plaintiff also claims that the ALJ's determination that the plaintiff had the residual functional capacity to return to her previous work was erroneous because of "the fact that the residual functional capacity was done on one day in her life." (Pl.'s Br. at 9.) Specifically, the plaintiff refers me to evidence that: 1) she called the person who performed her functional capacity evaluation to complain of aches and fatigue (*see* Tr. at 140); 2) she testi-

fied that she was in bed for three days following the evaluation (*see id.* at 52); 3) she testified that the evaluator allowed her to rest for 15–20 minutes between tasks (*see id.*); and 4) Dr. McMillan stated that he believed the plaintiff could not perform her previous work for more than one day per week (*see id.* at 533). (*See* Pl.'s Br. at 9.) The defendant admits that the plaintiff called the evaluator to complain of aches and fatigue after the evaluation, but maintains that there is no indication—apart from the plaintiff's own testimony—that the plaintiff was actually allowed to rest for up to twenty minutes between tasks. (*See* Defendant's Answer Brief (hereinafter "Def.'s Br.") at 19.) Instead, the defendant argues that the plaintiff stopped many tasks herself. (*See id.* (citing Tr. at 143–45).) In addition, the defendant claims that the ALJ properly determined that the plaintiff's statements concerning the severity of her pain and fatigue were not fully credible and that the opinion of Dr. McMillan was entitled to little weight.

 The ALJ found that the plaintiff was more restricted than was indicated by the functional capacity evaluation performed on October 28, 1999, (*see* Tr. at 26, 455–62), but that, as stated in the October 24, 2000, assessment, she retained the capacity for sedentary work (*see id.* at 26, 140–46). As I noted previously, the ALJ's decisions to discount the plaintiff's testimony concerning the severity of her pain and fatigue and to assign reduced weight to Dr. McMillan's opinion that the plaintiff could not perform her previous work for more than one day per week were supported by substantial evidence. (*See supra* Part III.A B.) In light of these findings, the ALJ's conclusion that the plaintiff retained the functional capacity to return to the "substantial gainful activity" she engaged in between November 1984 and May 28, 1999, is also supported by substantial evidence. The evidence shows that each person who indicated that the

plaintiff could not return to work based his opinion on the plaintiff's subjective complaints of pain and fatigue. This includes the statements by Drs. Bowar, Ayala, Zogg, and McMillan (*see* Tr. at 240, 465–66, 477, 533) and even the plaintiff herself (*see, e.g.,* Tr. at 42–43, 45, 48, 52, 55). Since the ALJ properly decided to discount these opinions in light of the evidence of the plaintiff's symptom exaggeration, I cannot say that his determination that the plaintiff could perform sedentary work as described in her functional capacity assessment is not supported by substantial evidence.

### D. Whether the Commissioner's Findings Are Supported by Substantial Evidence

The plaintiff argues that the ALJ's determination that the plaintiff was not disabled and could return to her past work is not supported by substantial evidence. The plaintiff points out that she decreased her workload from "twelve hours a day, seven days a week from November 1984 to February of 1994," to "between two and three hours a day one day per week from February of 1999 to May of 1999," and that because of this, the school she started with her partner was forced to close. (Pl.'s Br. at 11–12.) She argues that fatigue, pain, and swelling in her feet cause her to be unable to work, and that the ALJ disregarded these symptoms. (*See id.* at 12.) Also, she describes her daily activities, claiming that she needs to rest several times each day while experiencing memory problems due to her stroke and recurring abdominal pain. (*See id.* at 12–

13.) Finally, the plaintiff once again reviews her extensive history of medical treatment and points out that the ALJ never took into account the impact of the plaintiff's medication. (*See id.* at 14.) Specifically, she claims that Coumadin requires her to avoid "bumping herself and participating in activities whereby she could be hurt in any way," (*id.* at 14), although she has referred me to no evidence that supports this claim.

There can be no doubt that the plaintiff has received extensive medical treatment for a wide range of ailments. However, as I have noted above, the ALJ's determination that the plaintiff exaggerated the severity of her pain and fatigue is supported by substantial evidence. In addition, a number of physicians, including Dr. McMillan, noted that the plaintiff's stroke and its associated symptoms might have been psychological in origin. (*See* Tr. at 513. *See also, e.g., id.* at 227 28.) The plaintiff's conclusory assertion that the ALJ failed to take into account the effects of the plaintiff's medication does not warrant a reversal of the ALJ's determination. The ALJ reviewed the plaintiff's medical history in great detail and noted that she was receiving a variety of medications, including Coumadin. (*See* Tr. at 12–14, 16–25.)

 The ALJ recognized that the plaintiff was limited to sedentary work, but found that, given her residual functional capacity and accounting for her tendency to exaggerate her symptoms of pain and fatigue, she could perform her work at a level that qualified as "substantial gainful activity." [10] Based upon the record before

10. It must be recalled that the ALJ did not state that the plaintiff was capable of returning to her "twelve hours a day, seven days a week" work schedule. (Tr. at 27.) Such a finding would not have been supported by substantial evidence, given the limitations set forth in the plaintiff's functional capacity assessment. (*See, e.g.,* Tr. at 26 (not-

ing that the plaintiff could "sit up to one hour at a time for a total of six hours in an eight-hour day and she can stand for fifteen minutes at a time for a total of two hours in an eight-hour day.").) Instead, the ALJ concluded that the plaintiff could return to work that

me, I must conclude that this decision is supported by substantial evidence. Although it may be possible for reasonable minds to review the record in this case and arrive at different conclusions, this does not mean that the Commissioner's decision to deny benefits must be reversed. *See, e.g., Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir.1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989)). *See also Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir.1995) ("Further, we may not reverse a decision of the Secretary merely because substantial evidence would have supported an opposite conclusion.")

**IT IS ORDERED** that the Commissioner of Social Security's decision to deny the plaintiff's application for disability insurance benefits is affirmed, and the relief sought by the plaintiff in her Complaint, filing 1, is denied.

## JUDGMENT

In accordance with the Memorandum and Order on Review of the Final Decision of the Commissioner of Social Security:

**IT IS ORDERED** that the decision of the Commissioner is affirmed, and that the plaintiff's Complaint is dismissed.

constituted substantial gainful activity "despite being part-time in nature." (Tr. at 27.)